**CANDIS MITCHELL**
California Bar No. 242797
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
Candis_Mitchell@fd.org

Attorneys for Mr. Adan Guerrero-Flores

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE THOMAS J. WHELAN)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>**ADAN GUERRERO-FLORES**,<br><br>Defendant. | ) | CASE NO.: 08CR0718-W<br><br>DATE: MAY 5, 2008<br>TIME: 2:00 P.M.<br><br>STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS |

**I.**

**STATEMENT OF FACTS[1]**

**A. Arrest**

On February 11, 2008, at 5:50p.m., Border Patrol Agent Saldana responded to the international border fence west of Calexico, California, after a Remote Video Surveillance System Operator ("RVSSO") saw a group of four people climb over the fence and walk north. The RVSSO watched the individuals travel into the United States until Agent Saldana found the group. After detaining and questioning the individuals while they were riding in the car to the border patrol station, it is alleged that they all made statements indicating that they did not have immigration documents to enter or remain in the United States. It is alleged

1. The following is based primarily upon information supplied through Government discovery. Mr. Guerrero-Flores does not stipulate to its accuracy and reserves the right to challenge it at future proceedings.

that Mr. Guerrero-Flores was a member of that group.

**B. Interrogation**

Following his arrest, Mr. Guerrero-Flores was read his Miranda rights on February 12, 2008, at 7:45 a.m. by Border Patrol Agent Y. Lee. It is alleged that Mr. Guerrero-Flores waived his rights and made inculpatory statements as to whether he had documentation to enter into the United States and his alienage.

**C. Indictment**

On March 12, 2008, an indictment was handed down charging Mr. Guerrero-Flores with violating 8 U.S.C. §1326 (a) and (b), deported alien attempting to enter the United States who had been removed subsequent to April 9, 2003.

These motions follow.

## II.

## MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

Mr. Guerrero-Flores moves for the production of the following discovery. This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

To date, ***defense counsel has received only 26 pages of discovery***. Mr. Guerrero-Flores respectfully requests that the Government be ordered to produce discovery because Mr. Guerrero-Flores has reason to believe that he has not received all the discoverable material in his case. For example, Mr. Guerrero-Flores has received no documentation establishing that he was ever deported. Mr. Guerrero-Flores **specifically requests production of a copy of the taped proceedings and any and all documents memorializing the deportation proceeding allegedly held and any other proceedings that the Government intends to rely upon at trial**. This request includes discovery of materials known to the Government attorney, as well as discovery of materials which the Government attorney may become aware of through the exercise of due diligence. See FED. R. CRIM. P. 16.

Mr. Guerrero-Flores additionally requests that the Court order the Government to allow him the opportunity to review his A-file in its entirety. First, the A-file contains documentation concerning his alleged deportation. Part of Mr. Guerrero-Flores defense may be that his underlying deportation was invalid.

The documents in the A-file would help illuminate the validity or futility of such a defense. For example, A-file documents typically contain biographical information. Such information is essential to determining whether Mr. Guerrero-Flores's deportation was invalid.

Second, the Government will likely try to show at trial that a government officer searched the A-file and did not find an application by Mr. Guerrero-Flores for permission to enter the United States. Mr. Guerrero-Flores anticipates that the Government will attempt to admit a "Certificate of Non-Existence of Record" against him, arguing that if Mr. Guerrero-Flores had ever applied for permission to enter the United States, such an application would be found in the A-file and because such an application is not in the A-file, Mr. Guerrero-Flores must not have applied for permission to enter the United States.

Although the certificate might be admissible, the question of the thoroughness of the search conducted by the Government of the A-file is, and should be, open to cross-examination. United States v. Sager, 227 F.3d 1138, 1145 (2000) (error not to allow jury to "grade the investigation."). Mr. Guerrero-Flores should be able to review his A-file in order to see whether any application for lawful admission exists. Moreover, Mr. Guerrero-Flores should also be able to verify whether other documents that would ordinarily be in the A-file are "non-existent," or otherwise missing from his A-file. Mr. Guerrero-Flores may assert a defense that his application for lawful entry was lost or otherwise misplaced by the Government. He must be allowed the opportunity to review his A-file and the manner in which it is being maintained by the Government in order to present this defense. A proposed order is attached for the court's convenience.

In addition, Mr. Guerrero-Flores moves for the production of the following discovery:

1. **Mr. Guerrero-Flores's Statements.** The Government must disclose to Mr. Guerrero-Flores all copies of any written or recorded statements made by Mr. Guerrero-Flores; the substance of any statements made by Mr. Guerrero-Flores which the Government intends to offer in evidence at trial; any response by Mr. Guerrero-Flores to interrogation; the substance of any oral statements which the Government intends to introduce at trial and any written summaries of Mr. Guerrero-Flores's oral statements contained in the handwritten notes of the Government agent; any response to any Miranda warnings which may have been given to Mr. Guerrero-Flores; as well as any other statements attributed to Mr. Guerrero-Flores. FED. R. CRIM. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all Mr. Guerrero-Flores's statements, whether written or oral, regardless of

whether the Government intends to make any use of those statements. **Mr. Guerrero-Flores specifically requests all audio and videotaped copies of his statements and any rough notes taken pertaining to the substance of his statements.**

2. **Arrest Reports, Notes and Dispatch Tapes.** Mr. Guerrero-Flores also specifically requests the Government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate to the circumstances surrounding his arrest or any questioning. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of Mr. Guerrero-Flores or any other discoverable material is contained. Such material is discoverable under FED. R. CRIM. P. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963). The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to Mr. Guerrero-Flores. See FED. R. CRIM. P. 16(a)(1)(B) and (c), FED. R. CRIM. P. 26.2 and 12(i).

3. **Brady Material**. Mr. Guerrero-Flores requests all documents, statements, agents' reports, and tangible evidence favorable to Mr. Guerrero-Flores on the issue of guilt and/or which affects the credibility of the Government's witnesses and the Government's case. Under Brady, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

4. **Any Information That May Result in a Lower Sentence Under The Guidelines.** Notwithstanding the advisory nature of the sentencing guidelines, the Government must produce this information under Brady v. Maryland, 373 U.S. 83 (1963), because it is exculpatory and/or mitigating evidence relevant to a possible future determination with respect to sentencing.

5. **Mr. Guerrero-Flores's Prior Record.** Mr. Guerrero-Flores requests disclosure of his prior record. FED. R. CRIM. P. 16(a)(1)(B).

6. **Any Proposed 404(b) Evidence.** Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. Sufficient notice requires the government to "articulate precisely the evidential hypothesis by which

a fact of consequence may be inferred from the other acts evidence." United States v. Mehrmanesh, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); see also United States v. Brooke, 4 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming Mehrmanesh and reversing convictions).

This request includes any "TECS" records as well as any other record(s) of prior border crossings (voluntary entries) that the Government intends to introduce at trial, whether in its case-in-chief, as impeachment, or in its rebuttal case. Although there is nothing intrinsically improper about prior border crossings (except, as here, where there are allegations of undocumented status), they are nonetheless subject to 404(b), as they are "other acts" evidence that the government must produce before trial. United States v. Vega, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

The defendant requests that such notice be given three weeks before trial to give the defense time to adequately investigate and prepare for trial.

7. **Evidence Seized.** Mr. Guerrero-Flores requests production of evidence seized as a result of any search, either warrantless or with a warrant. FED. R. CRIM. P. 16(a)(1)(c).

8. **Request for Preservation of Evidence.** Mr. Guerrero-Flores specifically requests the preservation of all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the Government and which relates to the arrest or the events leading to the arrest in this case. This request includes, but is not limited to, the results of any fingerprint analysis, Mr. Guerrero-Flores's personal effects, and any evidence seized from Mr. Guerrero-Flores.

9. **Henthorn Material.** Mr. Guerrero-Flores requests that the Assistant United States Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved in the present case for impeachment material. See Kyles v. Whitley, 514 U.S. 419 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the Government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991); United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered to personally conduct examination of records; appropriate Government agency may review files and notify AUSA of contents as long as AUSA makes the determination regarding material to be disclosed); United States v. Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).

10. **Tangible Objects.** Mr. Guerrero-Flores requests the opportunity to inspect, copy, and test, as

necessary, all other documents and tangible objects, including photographs, books, papers, documents, fingerprint analyses, or copies of portions thereof, which are material to the defense, intended for use in the Government's case-in-chief, or were obtained from or belong to Mr. Guerrero-Flores. FED. R. CRIM. P. 16(a)(1)(c). **Specifically, Mr. Guerrero-Flores requests copies of the audio tapes of his alleged prior deportations or removals. Additionally, he requests any audio or video copies recordings of his alleged fence climbing and/or any conversation between the RVSSO and Border Patrol Agent Saldana**.

11. **Expert Witnesses.** Mr. Guerrero-Flores requests the name, qualifications, and a written summary of the testimony of any person that the Government intends to call as an expert witness during its case in chief. FED. R. CRIM. P. 16(a)(1)(E). The defense requests the notice of expert testimony be provided at a minimum of two weeks prior to trial so that the defense can properly prepare to address and respond to this testimony, including obtaining its own expert and/or investigating the opinions, credentials of the Government's expert and a hearing in advance of trial to determine the admissibility of qualifications of any expert. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (trial judge is "gatekeeper" and must determine, reliability and relevancy of expert testimony and such determinations may require "special briefing or other proceedings").

12. **Evidence of Bias or Motive to Lie.** Mr. Guerrero-Flores requests any evidence that any prospective Government witness is biased or prejudiced against Mr. Guerrero-Flores, or has a motive to falsify or distort his or her testimony.

13. **Impeachment Evidence.** Mr. Guerrero-Flores requests any evidence that any prospective Government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to Mr. Guerrero-Flores. See FED. R. EVID. 608, 609 and 613; Brady v. Maryland.

14. **Evidence of Criminal Investigation of Any Government Witness.** Mr. Guerrero-Flores requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.

15. **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.** Mr. Guerrero-Flores requests any evidence, including any medical or psychiatric report or evaluation, that

tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substances, or has ever been an alcoholic.

16. **Witness Addresses.** Mr. Guerrero-Flores requests the name and last known address of each prospective Government witness. Mr. Guerrero-Flores also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a Government witness.

17. **Name of Witnesses Favorable to Mr. Guerrero-Flores.** Mr. Guerrero-Flores requests the name of any witness who made an arguably favorable statement concerning Mr. Guerrero-Flores or who could not identify him or who was unsure of his identity, or participation in the crime charged.

18. **Statements Relevant to the Defense.** Mr. Guerrero-Flores requests disclosure of any statement relevant to any possible defense or contention that he might assert in his defense.

19. **Jencks Act Material.** Mr. Guerrero-Flores requests production in advance of trial of all material, including dispatch tapes, which the Government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid the possibility of delay at trial to allow Mr. Guerrero-Flores to investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963). In United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) the Ninth Circuit held that when an agent goes over interview notes with the subject of the interview the notes are then subject to the Jencks Act.

20. **Giglio Information & Agreements Between the Government and Witnesses.** Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Guerrero-Flores requests all statements and/or promises, express or implied, made to any witness, in exchange for their testimony in this case, and all other information which could be used for impeachment.

21. **Agreements Between the Government and Witnesses.** Mr. Guerrero-Flores requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement, promise, or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective

Government witness and the Government (federal, state and/or local). This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed, and specifically includes any discussion with a potential witness regarding that witness' immigration status and/or any affect that the witness' statements or lack thereof might have on that status, including the granting or revoking of such immigration status or any other immigration status, including but not limited to citizenship, nationality, a green card, border crossing card, parole letter, or permission to remain in the United States.

22. **Informants and Cooperating Witnesses.** Mr. Guerrero-Flores requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Guerrero-Flores. The Government must disclose the informant's identity and location, as well as the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v. United States, 353 U.S. 53, 61-62 (1957). The Government must disclose any information derived from informants which exculpates or tends to exculpate Mr. Guerrero-Flores. Brady v. Maryland, 373 U.S. 83 (1963)

23. **Bias by Informants or Cooperating Witnesses.** Mr. Guerrero-Flores requests disclosure of any information indicating bias on the part of any informant or cooperating witness. Giglio v. United States, 405 U.S. 150 (1972). Such information includes, but is not limited to, any inducements, favors, payments or threats that were made to the witness in order to secure cooperation with the authorities.

24. **Scientific and Other Information.** Mr. Guerrero-Flores requests the results of any scientific or other tests or examinations conducted by any Government agency or their subcontractors in connection with this case. See Rule 16(a)(1)(D).

25. **Residual Request.** Mr. Guerrero-Flores intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. Mr. Guerrero-Flores requests that the Government provide him and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

## III.

## THIS COURT SHOULD DISMISS THE INDICTMENT FOR ITS FAILURE TO ALLEGE ESSENTIAL ELEMENTS OF THE OFFENSE

Mr. Guerrero-Flores has been charged with attempted entry, a violation of Title 8 U.S.C. § 1326. The indictment fails to state an offense, since it does not allege that Mr. Guerrero-Flores committed an overt act -- a required element in "attempt" cases. See United States v. Gracidas-Ulibarry, 231 F.3d 1188, 1196 (9th Cir. 2000) (en banc). The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. Amend. V. An indictment's failure to "recite an essential element of the charged offense is not a minor or technical flaw . . . but a fatal flaw requiring dismissal of the indictment." United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999); see also, United States v. Pernillo-Fuentes, 252 F.3d 1030 (9th Cir. 2001).

The Ninth Circuit has recently held that "failure to allege any specific overt act that is a substantial step toward entry is a fatal defect in an indictment for attempted entry following deportation under 8 U.S.C. §1326." United States v. Resendiz-Ponce, 425 F.3d 729 (9th Cir. 2005).

### A. **The Commission of an Overt Act Is a Required Element in "Attempt Crimes"**

An overt act is required to protect the innocent from conviction for merely thinking about committing a crime. "The common law meaning of 'attempt' is the specific intent to 'engage in criminal conduct and ... an overt act which is a substantial step towards committing the crime.'" Gracidas-Ulibarry, 231 F.3d at 1192, citing United States v. Arbelaez, 812 F.2d 530, 534 (9th Cir.1987); accord United States v. Bailey, 444 U.S. 394, 405 (1980); Wooldridge v. United States, 237 F. 775, 778-79 (9th Cir.1916) (collecting common law sources "holding that, to constitute an attempt, there must be the intent to commit a crime and some act done toward its consummation, and that the term 'attempt' signifies both an act and the intent with which it is done"); 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 6.2, at 18 (1986) ("The crime of attempt . . . [at] common law . . . consists of: (1) an intent to do an act or to bring about certain consequences which would in law amount to a crime; and (2) an act in furtherance of that intent which . . . goes beyond mere preparation.").

The Ninth Circuit en banc has adopted the common-law definition of attempt and has held that "the elements of the crime of attempted illegal reentry into the United States under 8 U.S.C. § 1326 are: (1) the

defendant had the purpose, i.e., conscious desire, to reenter the United States without the express consent of the Attorney General; (2) *the defendant committed an overt act that was a substantial step towards reentering without that consent*; (3) the defendant was not a citizen of the United States; (4) the defendant had previously been lawfully denied admission, excluded, deported or removed from the United States; and (5) the Attorney General had not consented to the defendant's attempted reentry." Gracidas-Ulibarry, 231 F.3d at 1196 (emphasis added).

**B. The Indictment Must Be Dismissed Because It Does Not Allege an Overt Act That Was a Substantial Step Which Corroborates the *Mens Rea* of the Charged Offense.**

In an attempt to comply with Resendiz-Ponce, the indictment alleges that Mr. Guerrero-Flores "committed an overt act, to wit, crossing the border from Mexico into the United States, that was a substantial step towards committing the offense."

However, merely stating that a particular act is a substantial step, however, does not satisfy the Ninth Circuit's description of that element. The "purpose of [the] substantial step requirement in attempt crimes is to corroborate the actor's specific intent to commit the crime." Walters v. Maass, 45 F.3d 1355, 1349 (9th Cir. 1995) (citing United States v. Plenty Arrows, 946 F.2d 62, 66 (8th Cir. 1991)). Thus, the government must allege and prove "culpable intent and conduct constituting a substantial step toward commission of the crime that strongly corroborates that intent." United States v. DeRosa, 670 F.2d 889, 894 (9th Cir. 1982) (citing United States v. Snell, 627 F.2d 186, 187 (9th Cir. 1980)). The language employed in the indictment's substantial step allegation makes no reference to *mens rea* at all. Instead, it simply charges that Mr. Guerrero-Flores "committed an overt act, to wit, crossing the border from Mexico into the United States, that was a substantial step towards committing the offense." The grand jury thus did not find, nor was it asked to find, "a substantial step toward commission of the crime *that strongly corroborates [the requisite] intent*." See DeRosa, 670 F.2d at 894. The indictment therefore fails to state an offense against the United States.

Because "[f]ailure to allege an essential element of the offense is a fatal flaw not subject to mere harmless error analysis[,]" the Ninth Circuit "reverse[d] the judgment against Resendiz and direct[ed] the district court to dismiss the indictment without prejudice to reindict[]." Resendiz-Ponce, 425 F.3d at 732-33 (citing United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999)). Accord United States v. Pernillo-

Fuentes, 252 F.3d 1030, 1032 (9th Cir. 2001) (the remedy for the failure to allege an element of a section 1326 offense is dismissal). Accordingly, the instant indictment must likewise be dismissed because it fails to allege all essential elements of the offense of an attempted entry, in violation of 8 U.S.C. § 1326.

The purpose of an overt act element, in an attempt indictment, is to protect the innocent, by showing that the prohibited actions must be more than just thought or "mere preparation." See Rollin M. Perkins & Ronald N. Boyce, Criminal Law § 3.A.7, at 637 (3d ed. 1982). Without alleging an overt act the indictment fails to allege an essential element, and in doing so it fails to state an offense. This is a fatal flaw, and dismissal of the indictment is required. Du Bo, 186 F.3d at 1179.

**C. The Indictment must Be Dismissed Because If Fails to Set out Both the Date of a Prior Felony Conviction and Specific Date of Prior Removal from the United States**

Additionally, Mr. Guerrero-Flores argues that the indictment must be dismissed because it fails to allege in the indictment, in contravention to United States v. Salazar-Lopez, 506 F.3d 748 (9th Cir. 2007), *both* the dates of a previous felony conviction and of a previous removal from the United States, subsequent to that conviction. The indictment here is insufficient because it only alleges that Mr. Guerrero-Flores was removed from the United States subsequent to one unassociated date, October 28, 2005. It does not specifically provide the date of a previous removal nor the date of any alleged previous felony conviction. "An indictment's failure to recite an essential element of the charged offense is not a minor or technical flaw . . . but a fatal flaw." United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999). Since the indictment fails to allege all of the necessary elements of the offense, it must be dismissed.

## IV.

## THE COURT MUST SUPPRESS ANY STATEMENTS BY MR. GUERRERO-FLORES

**A. The Court Must Suppress Mr. Guerrero-Flores's Alleged Pre-Miranda Field Statements Because They Were Elicited as the Result of Custodial Interrogation.**

The material produced thus far by the government indicates that Agent Saldana first confronted and interrogated Mr. Guerrero-Flores, regarding his immigration status, shortly after 5:50 p.m. in an isolated area north of the International Border. This entire interrogation proceeded any form of administration of Miranda rights by the agents by approximately fouruteen hours.

"The ruling in Miranda prohibits 'custodial interrogation' unless the government first gives warnings

to the [subject of the interrogation]." United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir. 1990). Custodial interrogation occurs when under the totality of the circumstances the questions asked by the police are reasonably likely to elicit an incriminating response from the subject. Id. Although questions that include routine biographical information usually do not trigger the safeguard of Miranda v. Arizona, "[t]hat exception is inapplicable . . . where the elicitation of information regarding immigration status is reasonably likely to inculpate the [subject]." Id.

In United States v. Kim, 292 F.3d 971, 973 (9th Cir. 2002),[2] the Ninth Circuit noted that the following factors are to be considered in deciding whether or not a police-dominated atmosphere exists: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Id. (citations omitted); see also United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980) (in context of custody at the border "[t]he factors to be weighed are the language used to summon him, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the pressure exerted to detain him."). The Ninth Circuit also recognizes that "question[s] implying that [the agent] suspected [the defendant] of criminal activity" can give rise to a reasonable belief that one is not free to ignore the questions and leave. United States v. Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).[3]

It is not necessary that an individual be physically restrained in any fashion. In Beraun-Panez, the Ninth Circuit found that an individual questioned out in an open field, who was neither held nor handcuffed nor told that he was under arrest, was nonetheless in custody for Miranda purposes. Beraun-Panez held that "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding."

---

[2] In Kim, the Ninth Circuit found that a Korean woman who went to her own store, voluntarily, because an officer's visit prompted her to do so was in custody even though she was in familiar surroundings because the police "temporarily took over complete control of Kim's store creating a 'police-dominated atmosphere." 292 F.3d at 977. This combined with difficulty with English and isolation from family supported the finding that Kim did not willingly agree to submit to an encounter with the police. Id.

[3] Chavez-Valenzuela involved a roadside stop of a motorist on a public street, out in the open.

812 F.2d at 580.[4]

Here, the criteria for a police-dominated atmosphere as articulated in Kim are clearly met. Regarding the language used by Agent Saldana to summon Mr. Guerrero-Flores, while the report does not state the exact words used in identifying himself as a border patrol agent and to get Mr. Guerrero-Flores into custody, whatever words used clearly indicated to Mr. Guerrero-Flores that Agent Saldana was a law enforcement officer and that Mr. Guerrero-Flores was in custody. The facts that Agent Saldana was in uniform carrying his gun, and in an isolated area with no means to escape substantiate this factor. Additionally, Agent Saldana confronted a pedestrian Mr. Guerrero-Flores while in an isolated area, enhancing any belief that Mr. Guerrero-Flores would be unable to leave.

After confronting Mr. Guerrero-Flores, he and the other individuals were placed in the Border Patrol vehicle and transported to the border patrol station. It was only after they were on the way to the station that the individuals were asked questions about their nationality and their legal status within the United States. Under these circumstances, a reasonable person in a similar situation would have assumed that there were under arrest and under the totality of circumstances an incriminating statement would likely be issued from any form of questioning.

Concerning the extent to which Mr. Guerrero-Flores was confronted with guilt, he was apprehended in an isolated area, placed in the back of a border patrol vehicle, and then immediately interrogated about his immigration status. It is, however, unclear how long the detention took place or the amount of pressure applied to Mr. Guerrero-Flores since Agent Saldana's report does not address how long the interrogation and detention took and only uses boiler-plate language to describe Mr. Guerrero-Flores's responses.

Not only did the questioning here occur in a "police-dominated atmosphere" where Mr. Guerrero-Flores was isolated, the agent's questioning bore on Mr. Guerrero-Flores's alienage, which is an element of the charged offense, 8 U.S.C. § 1326. See United States v. Meza-Soria, 935 F.2d 166, 171 (9th Cir. 1991). This question in such a setting carried with it implicit suspicion of criminal activity. A person, such as Mr. Guerrero-Flores, subjected to such questioning in such a situation obviously does not reasonably feel free to leave, such as in a moving car, is thus subject to custodial interrogation. See Chavez-Valenzuela, 268

---

[4] The police confronted Beraun-Panez with his alienage, accused him of lying and kept him separated from his co-worker in a remote rural area. Beraun-Panez, 812 F.2d at 580.

F.3d 719, 725 (9th Cir. 2001).

In the context of an encounter between border patrol and an individual near the international border, any questioning regarding an individual's alienage falls under the rubric of custodial interrogation. Furthermore, because of the close relationship between civil and criminal immigration investigations, "[c]ivil as well as criminal interrogation of in-custody defendants by INS [agents] should generally be accompanied by the Miranda warnings." United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir. 1983).

Here, it is obvious that the information the agent elicited from Mr. Guerrero-Flores, during the interrogation, regarding his citizenship, application for permission to enter, and use of a document was "reasonably likely to inculpate" him. The questions served no purpose other than inculpation. They are in fact two of the four elements that they government must prove to obtain a conviction for a violation of 8 U.S.C. § 1326. Moreover, it is undisputed that Mr. Guerrero-Flores was not read his Miranda rights at that point, nor advised that his answers to the agent's questions could result in federal charges against him. Therefore, statements must be suppressed.

**B. Mr. Guerrero-Flores's Statements Post-Miranda Statements Should Be Suppressed as Involuntary Because They Were Obtained Outside the Safe-Harbor Period and He Was Not Arraigned Without Unnecessary Delay.**

Mr. Guerrero-Flores's post-arrest statements must be suppressed because they were taken more than fourteen hours after his arrest and the government failed to arraign him without unnecessary delay as required under Fed. R. Crim. P. 5(a)(1)(A).

Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer . . . ." Fed. R. Crim. P. 5(a)(1)(A). The "[p]rovisions related to Rule 5(a) contemplate a procedure that allows arresting officers little more leeway than the interval between arrest and the ordinary administrative steps required to bring a suspect before the nearest magistrate." Mallory v. United States, 354 U.S. 449, 453 (1957). The police must "arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined." Id. at 454. The arrested person may be booked, "[b]ut he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to

eliciting damaging statements to support the arrest and ultimately his guilt." Id.

"If a United States magistrate is not reasonably available under Rule 5(a), the arrested person shall be brought before a state or local judicial officer . . . and such officer shall inform the person of the rights specified in rule 5(c) and shall authorize the release of the arrested person . . ." Fed. R. Crim. P. 5, Advisory Committee Notes, 1972 Amendment. The language of this provision "reflects the view that time is of the essence." See Fed. R. Crim. P. 5, Advisory Committee Notes, 2002 Amendments.

"Legislation such as this requiring that the police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard--not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society." Mallory, 354 U.S. at 452 (quoting McNabb v. United States, 318 U.S. 332, 342-44 (1943)). In order adequately to enforce the requirement of prompt arraignment, it is necessary to render inadmissible incriminating statements elicited from defendants during a period of unlawful detention. Id. at 453.

In Mallory, for example, the Supreme Court found that "the circumstances of [the] case preclude a holding that arraignment was without unnecessary delay." Id. at 455. There, the defendant was arrested in the early afternoon, interrogated for approximately a half-hour, detained for an additional four hours, and interrogated again. Id. The defendant was not arraigned until the next morning. Id. at 451. In finding the statements inadmissible due to the unnecessary delay in arraignment, the Supreme Court emphasized that "[i]t is not the function of the police to arrest, as it were, at large and to use an interrogating process at police headquarters in order to determine whom they should charge before a committing magistrate . . . ." Id. at 456.

According to reports provided in discovery, Mr. Guerrero-Flores was detained on Monday, February 11, 2008, around 5.50 p.m. However, he was not interrogated by the agents until Tuesday, February 12, 2008, at 7:45 a.m. Finally, the government waited until Wednesday, February 13, 2008, to arraign Mr. Guerrero-Flores. As such, he was not taken "without unnecessary delay before a magistrate judge, or before a state or local judicial officer . . . ." as required by Rule 5. Therefore, Mr. Guerrero-Flores's statements must be suppressed.

Pursuant to 18 U.S.C. § 3501(c), delay in presentment, beyond six hours, requires suppression of any

incriminating statements made thereafter. Section 3501(c) provides:

> In any criminal prosecution by the United States . . . a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit person charged with offenses against the laws of the United States . . . if such confession is found by the trial judge to have been voluntarily made and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention . . .

"The clear meaning of this provision is that delay alone permits suppression when any of these requisites are not met." United States v. Perez, 733 F.2d 1026, 1031 (2d Cir. 1984). Thus, the Ninth Circuit has held that "there must be circumstances in which delay in arraignment will require suppression of a confession regardless of the voluntariness of the confession." United States v. Alvarez-Sanchez, 975 F.2d 1396, 1401 (9th Cir. 1992), overruled on other grounds, 511 U.S. 350 (1994) (holding that the exclusionary rule—due to delay in arraignment—does not apply where the person is detained solely on state charges). See also Perez, 733 F.2d at 1031 ("[§] 3501 leaves the *McNabb-Mallory* rule intact with regard to confessions obtained after a six hour delay"); United States v. Robinson, 439 F.2d 553, 563-64 (same).

Because Mr. Guerrero-Flores's was not promptly arraigned before a magistrate judge or other state or local official, his statements must be suppressed.

Delay in interrogating a defendant "can provide the sole basis for a finding of involuntariness, if the delay exceeds six hours." United States v. Manuel, 706 F.2d 908, 913 (9th Cir. 1983). In United States v. Wilson, the Ninth Circuit stated that "the fact that unreasonable delay, alone, beyond six hours may support a finding of involuntariness suggests that unreasonable delay is the most important factor of all [in the 3501 analysis]." 838 F.2d 1081, 1085 (9th Cir. 1988). Wilson further explains "if unreasonable delay in excess of six hours can itself form the basis for a finding of involuntariness, that same delay may also suggest involuntariness of the Miranda waiver." Id. at 1086. Finally, in Alvarez-Sanchez, 975 F.2d at 1400-01, the Ninth Circuit noted that while delay prior to obtaining a confession may be a basis for finding statements to be involuntary, pre-confession delay (as opposed to pre-arraignment delay) need not be unreasonable to warrant suppression. Because any statements made by Mr. Guerrero-Flores's were obtained fourteen hours after his detention, this Court should find that any Miranda waiver and subsequent statements were involuntary, and thus, inadmissible.

**C. <u>Mr. Guerrero-Flores Requests a Hearing Pursuant to 18 U.S.C. § 3501 Concerning The Admissibility Of Any Statements That The Government Intends to Use Against Him at Trial.</u>**

This Court should conduct an evidentiary hearing to determine whether any statements made by Mr. Guerrero-Flores's should be admitted into evidence. Under 18 U.S.C. § 3501(a), this Court is required to determine, outside the presence of the jury, whether any statements made by Mr. Guerrero-Flores were voluntarily made. In addition, § 3501(b) requires this Court to consider various enumerated factors, including whether Mr. Guerrero-Flores understood the nature of the charges against him and whether he understood his rights.

Moreover, section 3501(a) requires this Court to make a factual determination. Where a factual determination is required, courts are obligated to make factual findings by Fed. R. Crim. P. 12. <u>See</u> <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" <u>Id.</u> at 610 (quoting <u>Waller v. Georgia</u>, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleadings.

**V.**

**<u>MOTION TO DISMISS THE INDICTMENT DUE TO A GRAND JURY VIOLATION</u>**

**A. <u>Introduction</u>.**

The indictment in this case was returned by the January 2007 grand jury. United States District Court Judge Larry A. Burns voir dired and instructed the grand jury on January 11, 2007. <u>See</u> Ex. A, and Reporter's Transcript of Proceedings, dated January 11, 2007, attached as Exhibit B (voir dire). Judge Burns's instructions to the impaneled grand jury amount to structural error. First, Judge Burns' instructions erroneously constrains the power of the grand jury in violation of <u>United States v. Williams</u>, 504 U.S. 36, 49 (1992) and <u>Vasquez v. Hillary</u>, 474 U.S. 254 (1986). Second, Judge Burns's instructions conflict with <u>Williams</u>' holding that there is no duty to present exculpatory evidence to the grand jury, leaving the grand jury with the erroneous impression that all evidence undercutting probable cause will be presented to them, making it unnecessary for the grand jury to conduct any independent investigation of their own.

**B. <u>*Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of</u>**

**the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far narrowly rejected such challenges, it has, in the course of adopting a highly formalistic approach[5] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions in this case cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See Williams, 504 U.S. at 49.

Significantly, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I) (Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial."). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who

---

5 See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez, 474 U.S. 254. See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense—all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

Id. (quoting Vasquez, 474 U.S. at 263).

The Supreme Court has itself reaffirmed Vasquez's description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit. But not in Judge Burns's instructions.

The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

Diction and Language Guide 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. Judge Burns's grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or his to assess "the need to indict." Vasquez, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, see Ex. A at 4, 8, in context, it is clear that he could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly he was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of protecting the innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

"responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if Judge Burns said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended two different meanings of the word "should" in the space of two consecutive sentences. That could not have been his intent. But even if it were, no grand jury could ever have had that understanding.[6] Jurors are not presumed to be capable of sorting through internally contradictory instructions. See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory, on multiple occasions:

The first occasion occurred in the following exchange when Judge Burns conducted voir dire and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective juror. Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment

---

6 This argument does not turn on Mr. Guerrero-Flores's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible. Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

On another occasion, in an even more explicit example of what "should" meant, Judge Burns makes clear that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

> Court . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here." You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

As if the preceding examples were not enough, Judge Burns continued to pound home the point that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See

id. at 61.

And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court: In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court: Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized consideration of penalty information. See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in Vasquez:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). Thus, the indictment must be dismissed. Id.

The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the instructions' excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion—its independence—[to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." Id. at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury—particularly the secrecy of the proceedings and unreviewability of many of its decisions—sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." Id.

In setting forth Judge Hawkins' views, Mr. Guerrero-Flores understands that this Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", especially in light of the instructions and commentary by Judge Burns during voir dire discussed above—unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states they enjoy. He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned his own rules and enforced them.

## C. The Instructions Conflict with *Williams*' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.

In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. See 504 U.S. at 45, 51. Williams held that "as a general matter at least, no such 'supervisory' judicial authority exists." See id. at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id. at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law. See id. at 51-55.

Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added). Moreover, Judge Burns later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or

that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1) I have to consider evidence that undercuts probable cause.

(2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3) Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation—if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time—and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

This is particularly troubling in this case, because government-produced discovery makes clear that the prosecutors in this case had ample exculpatory evidence at their disposal by the time the grand jury met to pass on Mr. Guerrero-Flores's indictment. Mr. Guerrero-Flores denied knowledge of the marijuana in the face of skilled and aggressive interrogation. Given Judge Burns's instructions, if the prosecutors in Mr. Guerrero-Flores's case did not in fact present exculpatory evidence, the grand jury would have been misled into believing that there was no exculpatory evidence, because the prosecutor would not—as Judge Burns put it—"play hide the ball." See Ex. B at 14-15. Thus, in this case, unless the prosecutor presented the exculpatory evidence available to him, including the evidence of Mr. Guerrero-Flores's repeated denials,

the grand jury was fatally misled.

Unless the prosecutor concedes that the grand jury was not, in fact, presented with exculpatory evidence in the prosecutor's possession (in which case, the indictment should be dismissed), Mr. Guerrero-Flores moves for production of Mr. Guerrero-Flores's grand jury proceeding so that this issue can be resolved on the full evidence.

## VI.

## MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

Defense counsel has incomplete discovery at this time, and contemplates further motions, once discovery is received and reviewed with Mr. Guerrero-Flores. Therefore, counsel requests leave to file additional motions once discovery is completed.

## VII.

## CONCLUSION

For the foregoing reasons, Mr. Guerrero-Flores respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated: April 14, 2008

*s/ Candis Mitchell*
**CANDIS MITCHELL**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Guerrero-Flores
Candis_Mitchell@fd.org